UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* Subpoena to Donovan Slack,<br><br>                    **Non-Party Movant.** | Misc. Case No. 11-00073 (BAH)<br>Judge Beryl A. Howell |
| **Bruce Peck,**<br>      **Plaintiff,**<br><br>        v.<br><br>**City of Boston,**<br>      **Defendant.** | Civil Action No. 09-10606-JGD (D. Mass) |

## MEMORANDUM OPINION

      This matter presents competing First Amendment interests between a non-party reporter asserting a First Amendment reporter's privilege and a plaintiff seeking to vindicate his First Amendment free speech rights. The plaintiff Bruce Peck, a former street performer, has filed a lawsuit, pursuant to 42 U.S.C. § 1983, against the City of Boston in the District of Massachusetts. *Peck v. City of Boston*, Civil No. 09-10606-JGD (D. Mass). On January 26, 2011, the plaintiff served a subpoena noticing the deposition of Donovan Slack, a newspaper reporter, who authored a story concerning Boston's "crackdown" on street performers. Slack Mot. Quash, David McCraw Decl. ("McCraw Decl."), Ex. A. Specifically, the plaintiff seeks testimony from this reporter about space restrictions imposed by the city on street performers at the city's Faneuil Hall beginning in the summer of 2008 and continuing in force today. McCraw Decl., Ex. B, *Peck v. City of Boston*, Civil No. 09-10606-JGD, Memorandum of Decision and Order on Cross-Motions for Summary Judgment, Nov. 1, 2010, at 3-4. On February 14, 2011,

1

Ms. Slack moved to quash the subpoena directed toward her. After review of the memoranda filed in support and opposition to the motion, the accompanying declarations and applicable law, the Court GRANTS Ms. Slack's Motion to Quash for the reasons stated below.

**BACKGROUND**

Ms. Slack is a reporter for The Boston Globe (hereinafter "the Globe"), a daily newspaper based in Boston, Massachusetts. Slack Mot. Quash, Donovan Slack Decl. (hereinafter "Slack Decl."), at ¶ 1. On August 1, 2008, the Globe published an article written by Ms. Slack entitled *"A Rhythmic, Rocking Cradle of Liberty No More, City Corrals Street Artists at Faneuil Hall."* *Id.* at ¶ 3. In this article, Ms. Slack reported on the City of Boston's restrictions on street performers working near Faneuil Hall, a historic landmark and tourist attraction located in downtown Boston. *Id.* at ¶¶ 3-4. The article specifically relayed that in late July 2008 "city security officers descended on the plaza around nearby Faneuil Hall and imposed new restrictions on the artists who have become accustomed to entertaining the crowds on the historic site, known on tourist brochures as the Cradle of Liberty." McCraw Decl., Ex. A, at 1. The article further stated that "[Boston Police Officers] shooed away clowns and caricature artists. They ordered music and dance acts to contain their performances to a single, small patch of brick – measuring 15 feet by 15 feet – near a stand of trees." *Id.* The article contains quotes from a number of individuals, including Boston Mayor Thomas Menino's spokeswoman, Dot Joyce; street performers Gayle Gazdik and James Geddie; Jennifer Achevarria, a Faneuil Hall restaurant manager; and Sarah Moore, a tourist visiting Boston with her family from Quebec. *Id.* The article also identifies various other individuals in the area, including other street performers affected by the city's new regulations, such as "a group of drummers calling themselves the 'Bucket Boys,'" a caricature artist named "Madman with a Marker," and "an eight-person dance

troupe called 'Breeze Team.'" *Id.* In gathering information for the story, Ms. Slack states that she visited Faneuil Hall and its surrounding area on a single date, July 31, 2008, and she has no other knowledge regarding the alleged restrictions placed upon street performers. Slack Decl., at ¶¶ 4-6.

On April 16, 2009, the plaintiff filed a lawsuit in the U.S. District Court for the District of Massachusetts, alleging that the City of Boston violated his constitutional right to free speech by restricting the area in which he could perform. Pl.'s Opposition Mot. Quash, Ex. J, *Peck v. City of Boston*, Civil No. 09-10606-JGD, Compl., Apr. 16, 2009. In the course of the lawsuit, the plaintiff submitted Rule 26(A)(1) initial disclosures, in which he identified four people likely to have discoverable information to support his claims: the plaintiff himself, street performer Gail (Pizzaz), an individual named Stephen Baird, and Donovan Slack. Pl.'s Opposition Mot. Quash, Ex. G, *Peck v. City of Boston*, Civil No. 09-10606-JGD, Pl.'s Initial Disclosures, July 10, 2009. During discovery, the plaintiff did not attempt to depose Ms. Slack, but did depose several other individuals, including Steve Crosby, the Deputy Commissioner responsible for Faneuil Hall's management; Chief Michael Galvin, who requested metal barricades be placed around Faneuil Hall, and Detective Sergeant Dan Downey, who was the police supervisor at Faneuil Hall in July 2008. McCraw Decl., at ¶13.

Following the discovery period, the plaintiff and the defendant filed cross-motions for summary judgment. The district court denied both motions on November 1, 2010, stating that factual issues remained in dispute, including (1) the purpose of the City's restrictions; and (2) the size of the designated performance area. *Peck v. City of Boston*, No. 09-10606, 2010 U.S. Dist. LEXIS 116128, at *18-21 (D. Mass. Nov. 1, 2010). The court stated that these facts are necessary to determine the government's intent in regulating street performances, and whether

alternate channels of communications were available to adversely affected performers. *Id.* at \*13 ("the question whether the City's policy is constitutional depends on whether it is narrowly tailored to serve a significant government interest and whether it leaves open ample alternative channels of communication. Because the record establishes that there are questions of material fact on these issues, neither party is entitled to summary judgment."). To resolve these factual disputes, the court scheduled trial for April 11, 2011. Slack Mot. Quash, at 2.

On January 26, 2010, the plaintiff served Ms. Slack with a subpoena, issued by the U.S. District Court for the District of Columbia, to be deposed in connection with the plaintiff's case against the City of Boston.[1] In a letter sent with the subpoena, plaintiff's counsel explained:

> Our primary purpose in seeking Ms. Slack's deposition is to confirm Ms. Slack's observations presented in her August 1, 2008 Boston Globe article concerning the physical layout of the restricted street performance area in Faneuil Hall and statements made by City officials that were quoted in the article.

McCraw Decl., Ex. C, Letter from Shane Early to David McCraw dated Jan. 26, 2011. Ms. Slack filed the instant motion to quash, on February 14, 2010, asserting that the reporter's privilege "founded in the First Amendment" allows her to avoid compliance with the plaintiff's subpoena. Slack Mot. Quash, at 1.[2] Since the date of the noticed deposition has passed and the trial is scheduled for April 11, 2011, the plaintiff seeks a prompt ruling on this matter in order to have the opportunity to re-schedule the deposition prior to the date of the trial. Pl.'s Opposition Mot. Quash, at 2, 10.

---

[1] Ms. Slack currently resides in Washington, DC. Slack Decl., at ¶ 1. The subpoena noticing her deposition testimony for February 16, 2011 was therefore issued by this Court. FED. R. CIV. P. 45(a)(2)(B).

[2] Ms. Slack also seeks to quash the subpoena on the basis of the common law reporter's privilege and on grounds that requiring her testimony would be unreasonably cumulative and burdensome under FED. R. CIV. P. 26(b)(2). Since this motion is decided on the basis of Ms. Slack's First Amendment reporter's privilege, the other arguments put forth in support of the motion to quash will not be considered.

**LEGAL STANDARD**

The Federal Rules of Civil Procedure grant a party broad power to gather information in connection with its case. Parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense," even if the material would not admissible at the trial. FED. R. CIV. P. 26(b)(1). A person who withholds otherwise discoverable material or testimony based upon a claim of privilege bears the burden of demonstrating that the privilege applies and that withholding is excused. *See In the Matter of an Application to Enforce Administrative Subpoena of the U.S. Commodities Futures Trading Comm'n v. McGraw-Hill Co., Inc.*, 507 F. Supp. 2d 45, 50 (D.D.C. 2007); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 120 n.4 (D.D.C. 2002); *see also* FED. R. CIV. P. 26(b)(5); FED. R. CIV. P. 45(c)(3). When this burden is met, Courts are directed to quash or modify a subpoena that requires "disclosure of privileged or other protected matter, if no exception or waiver applies." FED. R. CIV. P. 45(c)(3).

Courts have recognized a qualified privilege under the First Amendment for reporters to protect them from compelled disclosure of information, which they have obtained as part of their news gathering role. *See Zerelli v. Smith,* 656 F.2d 705, 711 n.39 (D.C. Cir. 1981) ("The Supreme Court explicitly acknowledged the existence of First Amendment protection for news gathering," citing *Branzburg v. Hayes*, 408 U.S. 665, 681, 707 (1972) (emphasizing that "news gathering is not without its First Amendment protections.")); *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1972) (instructing courts to limit impingements on press freedom and "make compelled disclosure by a journalist a last resort after pursuit of other opportunities have failed."); *see also Hutira*, 211 F. Supp. 2d at 118 ("Courts have recognized that the First Amendment provides journalists with a qualified privilege against compelled disclosure of information"). The reporter's privilege stems from recognition of the "preferred position of the

5

First Amendment" in our society and "the importance of a vigorous press." *Zerelli,* 656 F.2d. at 712. Courts have minimized impositions upon the press, particularly when burdens may have a chilling effect on a reporter's ability to investigate and gather news. *Carey*, 492 F.2d at 639 (courts instructed to "always be alert to the possibilities of limiting impingements upon press freedom to the minimum."). Nevertheless, a reporter's "privilege is not absolute [] and may be abrogated upon a sufficient showing by the party seeking the information." *Hutira*, 211 F. Supp. at 118; *see also McGraw-Hill,* 507 F. Supp. 2d at 51.

Courts have rigorously protected reporters asserting privilege when a litigant seeks to compel disclosure of confidential information. *See*, *e.g., Zerelli*, 656 F.2d 705; *Hutira*, 211 F. Supp. 2d 115. A reporter's privilege does not dissolve, though, when a litigant seeks nonconfidential information. *See Hutira,* 211 F. Supp. 2d at 120 ("All of the federal circuit courts of appeal that have addressed this question, however, have concluded that the privilege for journalists shields both confidential and nonconfidential information."). Indeed, it is "a misconception of the scope of the free press interest" to believe that a reporter's privilege does not apply to nonconfidential information. *Nat'l Labor Rel'n Bd. v. Mortensen,* 701 F. Supp 244, 247 (D.D.C. 1988); *see also Hutira*, 211 F. Supp. 2d at 120-21; *In re Subpoena to Jeffery Goldberg*, 693 F. Supp. 2d 81, 85 (D.D.C. 2010) (quashing defendant's subpoena for reporter's testimony about unpublished statements even though those statements were not confidential).

Indeed, "[t]he wholesale abrogation of the privilege for nonconfidential information would have a ripple effect felt far beyond any single lawsuit or newspaper article." *Hutira*, 211 F. Supp. 2d at 121. If a reporter's privilege did not apply to nonconfidential information, it would result "in a wholesale exposure of press files to litigant scrutiny [and] would burden the press with heavy costs of subpoena compliance . . . [P]ermitting litigants unrestricted, court-

enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Gonzales v. Nat'l Broadcasting Co., Inc.*, 194 F.3d 29, 35 (2d Cir. 1999). For this reason, a reporter's privilege is implicated even when he is sought only to authenticate or confirm otherwise nonconfidential or public information. *See Mortensen*, 701 F. Supp. at 247 ("The fact that their purpose is to support, rather than undermine, the bone fides of the statements as expressed by the reporters makes no difference. Such discovery necessarily implicates the First Amendment interests of journalists.").

That said, however, when a party seeks to compel a reporter to testify regarding nonconfidential information, the risk of debilitating a journalist's ability to gather information is considerably diminished. Consequently, the showing needed to overcome a reporter's privilege when the information sought is nonconfidential is "less demanding than the showing required where confidential materials are sought." *Hutira*, 211 F. Supp. 2d at 120; *see also Mortensen*, 701 F. Supp. at 248 (lesser showing of need and materiality is required for disclosure of nonconfidential information).

To determine whether a reporter's privilege should be overridden, the Court "look[s] to the facts of each case," balancing the public interest in protecting a reporter's privilege and the private interest in compelling a reporter to provide information. *See Zerelli,* 656 F.2d at 712; *see also Lee v. Dep't of Justice*, 413 F.3d 53, 58 (D.C. Cir. 2005). In civil cases, the reporter's privilege is "readily available," Z*erelli*, 656 F.2d at 712; *see also Mortensen*, 701 F. Supp. at 247, and "typically prevails because any interest in overcoming the privilege is by definition a private rather than public interest." *McGraw-Hill,* 507 F. Supp. 2d at 51. Privilege also typically

prevails because "compelled disclosure by a journalist [is] a last resort after pursuit of other opportunities has failed." *Carey*, 492 F.2d at 639.

Courts in this Circuit have applied a two-pronged balancing test to determine whether the reporter's privilege prevails to block disclosure to a civil litigant of otherwise discoverable information held by a nonparty reporter. First, the court must evaluate the litigant's need for the information. As part of this consideration, the court must examine how important, not just relevant, the reporter's information is to the party's case. If the information is crucial, then the balance of interests favors disclosure. *See, e.g., Zerelli,* 656 F.2d at 713-14; *Carey*, 492 F.2d at 636-37 (overriding the privilege when the information goes to the "heart" of the claim); *McGraw-Hill,* 507 F. Supp. 2d at 52 (since "requested documents comprise evidence of causation . . . and go to the heart of the Commission's case . . . the reporter's privilege cannot prevent their disclosure"); *Mortensen,* 701 F. Supp at 249 (reporters' testimony "very important" overriding privilege, when quoted management officials denied making published statements and reporters were only witnesses ). Second, the court must consider whether the party seeking the information has exhausted all reasonably available alternative sources.[3] *Zerelli*, 656 F.2d at 714; *see also Goldberg*, 693 F. Supp. 2d at 85 (quashing subpoena because litigant did not exhaust alternative sources and testimony would be duplicative).

For the reasons set forth below, the Court finds that Ms. Slack has sustained her burden establishing that she is entitled to assert the reporter's privilege and that the plaintiff has not made a sufficient showing to overcome application of that privilege here.

---

[3] In *Zerelli*, the D.C. Circuit cited as a third factor whether the reporter seeking to avoid disclosure of information was a party to the case. *Zerelli*, 656 F.2d at 714. The court stated that "[w]hen the journalist is a party, and successful assertion of privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure." *Id.* Ms. Slack is not a party in this case. The Court therefore considers the other two factors identified by the D.C. Circuit. *See McGraw-Hill,* 507 F. Supp. 2d 45 (discussing only litigant's need for information and exhaustion of alternate sources).

**DISCUSSION**

It is undisputed that Ms. Slack is a reporter for The Boston Globe and that the plaintiff is seeking her deposition testimony to confirm information originally reported in Ms. Slack's story published in the newspaper on August 1, 2008. Under these circumstances, Ms. Slack contends that she holds a reporter's privilege that precludes her compelled testimony. The plaintiff asserts that the privilege available to journalists as grounds for quashing a subpoena is qualified only and does not extend to a reporter's personal observations, particularly those that are already public. Pl.'s Opposition Mot. Quash, at 1, 4. Ironically, the plaintiff seeks to use the very basis for assertion of the reporter's privilege as grounds to deny the privilege; essentially, his argument is that even though Ms. Slack made the observations as part of her reporting job, her observations make her a witness and the information sought from Ms. Slack is not confidential because it has already been published. *Id*. at 2. The fact that nonconfidential information is obtained by a reporter during the course of news gathering may weaken, but not dissolve, the assertion of the reporter's privilege. Therefore, the Court finds that Ms. Slack has appropriately invoked the reporter's privilege. *See Hutira*, 211 F. Supp. 2d at 120, n.4 ("Courts engage in the balancing test . . . only after the reporter . . . has demonstrated that the privilege applies"). The Court must next apply the two-pronged balancing test and inquire whether the plaintiff has demonstrated the necessity of obtaining information from Ms. Slack because information she can provide about the restrictions imposed by the City of Boston are crucial to his case and unavailable from alternative sources.

*1. Plaintiff's Need for the Information Sought from Ms. Slack*

In order to overcome a reporter's privilege, the party seeking to compel disclosure of information must first demonstrate that the information sought is "critical" and goes to "the heart

9

of [the litigant's claim]." *Zerelli*, 656 F.2d at 713. In the present case, the plaintiff stated in a letter to Ms. Slack's counsel that the "primary purpose" of Ms. Slack's deposition is to "confirm Ms. Slack's observations presented in her August 1, 2008 Boston Globe article concerning the physical layout of the restricted street performance area in Faneuil Hall . . . ." McCraw Decl., Ex. C, Letter from Shane Early to David McCraw dated Jan. 26, 2011.[4] The relevant inquiry is therefore whether Ms. Slack's testimony regarding the size of the restricted area is central to the plaintiff's case.

The plaintiff alleges in the underlying action that the City of Boston violated his freedom of speech by restricting street performances to a certain area. The district court denied the plaintiff and defendant's cross-motions for summary judgment, in part, because the size of the area designated for street performances remained disputed. Specifically, the court noted that "Peck argues that the size of the Designated Area has made performance at Faneuil Hall 'essentially impossible,' while the city contends that the Designated Area is more than sufficient to accommodate Peck's [street performance]." *Peck,* 2010 U.S. Dist. LEXIS 116128, at *20. The Court further stated if the defendant was correct about the size of the restricted area, the plaintiff would no longer have a viable claim:

> Peck contends that the Designated Area consists of only 225 square feet, and cannot accommodate more than one or two street performances at a time, while the City asserts that Designated Area is substantially larger, covering about 5,000 square feet. . . . [The plaintiff] does not dispute that if the City is correct about the size of the Designated Area, it would provide him with ample opportunity to perform his act.

---

[4] The plaintiff's letter also indicated that he sought Ms. Slack's testimony to confirm "statements made by City officials that were quoted in the article." *Id.* The plaintiff has since represented to the Court that he no longer seeks testimony regarding statements made by City officials, but only wants Ms. Slack to confirm the physical layout of the designated street performance area. Pl.'s Opposition Mot. Quash, at 4 n.1.

*Id.* at *20-21. The plaintiff seeks Ms. Slack's testimony solely to confirm the size of the area designated for street performances.[5] This factual issue is certainly critical to the Massachusetts district court's time, place and manner analysis of the First Amendment burdens at issue in plaintiff's case, and goes to the heart of the plaintiff's claim against the City of Boston.

*2. Plaintiff's Efforts to Obtain Information from Alternate Sources*

In addition to demonstrating that Ms. Slack's testimony is critical to his case, however, the plaintiff must also demonstrate that no alternate source for the information exists. The plaintiff's effort to obtain alternate sources is "of central importance." *Zerelli*, 656 F.2d at 713. "Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Id.; see also Hutira,* 211 F. Supp. 2d at 122 (failure to exhaust alternative sources weighed "so heavily in favor of quashing the subpoena" that court declined to consider whether information sought was central to the litigant's case). "This requirement reflects the principle that the privilege should be abrogated only as a last resort." *McGraw-Hill*, 507 F. Supp. 2d at 55. Exhaustion of alternative sources must be determined "on a case-by-case basis." *Lee*, 413 F.3d at 61. Generally, a litigant is considered to have exhausted other sources when a reporter is the only source for the information, or when additional discovery becomes unreasonable. *Id.* ("litigants need not be made to carry wide-ranging and onerous discovery burdens where the path is ill-lighted," quoting *Carey,* 492 F.2d at 639); *see also Mortensen*, 701 F. Supp. at 248 ("where journalist appears to be the only one with access to

---

[5] Ms. Slack argues that her single day of observations on July 31, 2008 at Faneuil Hall occurred after the last date plaintiff attempted to perform there on July 27, 2008 and that, consequently, her observations would not be relevant to any speech restrictions applied to the plaintiff. Slack Reply Mem. Support of Mot. Quash, at 2. Plaintiff's complaint is not limited to a time period ending with his last attempted performance and therefore her observations may be relevant. Pl.'s Opposition Mot. Quash, Ex. J, Compl. at ¶¶ 18-19.

11

the information relevant to the case, courts are willing to compel disclosure" and there is "clearly no other source.").

The plaintiff contends that the designated area for street performances changed over time "so it is not possible to determine the size of the area in the summer of 2008 by having someone measure the area in later summers or today."  Pl.'s Opposition Mot. Quash, at 8-9.  Plaintiff further asserts that he has "searched for and contacted potential witnesses, served document requests, served interrogatories, and deposed City officials including a Rule 30(b)(6) witness for the City"; and these efforts have not yielded the information that he seeks from Ms. Slack. *Id.* at 8.

While all of these assertions may be true, the plaintiff has provided the court with only general descriptions of his efforts and these descriptions are insufficient to sustain his burden of showing that alternative sources are unavailable.  The plaintiff's affidavit, for example, states only that "street performers are transient" and that the plaintiff has "had difficulty finding witnesses."  Pl.'s Opposition Mot. Quash, Ex. E, Peck Aff., at ¶¶ 1-2.  Such statements are simply not sufficient. *See Grunseth v. Marriot Corp.*, 868 F. Supp. 333 (D.D.C. 1994) ("[P]laintiff has not demonstrated, other than in conclusory language, that he has exhausted all other reasonable sources for obtaining the information."); *Hutira*, 211 F. Supp. 2d at 122 (granting motion to quash even though litigant "list[ed] specific things" done to try to obtain information related to the alleged political assassination of her father).  The court will only override a reporter's privilege as a last resort, and the plaintiff has failed to demonstrate that he attempted to identify other sources.  He has not provided the Court with specific details regarding efforts he has taken, the number of witnesses he tried to contact, depositions he attempted, or even the number of hours he spent attempting to track down alternate eyewitnesses.

Even if the plaintiff did supply this information, the Court remains skeptical that alternate sources are unavailable to establish the size of the area designated for street performances in July 2008. Faneuil Hall is a popular Boston landmark and the plaintiff seeks information associated with incidents that took place in full view of the public. *Cf. Hutira*, 211 F. Supp. 2d at 122 (litigant failed to exhaust alternate sources in case where reporter was sought to confirm information regarding alleged political assassination of litigant's father by operatives of the Iranian government). The plaintiff has not stated that he approached local business owners, street vendors, residents, local police responsible for enforcing the restrictions or even individuals who frequently pass through the area. *See Clyburn v. News World Commc'n*, Inc., 903 F.2d 29, 35 (D.C. Cir. 1990) (affirming lower court's decision to quash subpoena because litigant "utterly failed to pursue obvious alternative sources of information."); *Mortensen*, 701 F. Supp. at 248 (denying reporter's motion to quash because there was "clearly no other source" for the information sought). Furthermore, the plaintiff seeks Ms. Slack's testimony to confirm that the restricted area in question was 15 feet by 15 feet, while the defendant contends that the designated area comprised 5,000 feet. *See Peck,* 2010 U.S. Dist. LEXIS 116128, at *20-21. The difference between these two positions is significant. Casual observers who happened to pass through the Faneuil Hall area in July 2008 would likely be able to tell the difference between those two sizes to confirm, or refute, the plaintiff's contention that the area in question was limited to 15 feet by 15 feet, as opposed to 5,000 feet.

The plaintiff may be having "difficulty" in locating sources to confirm that the area designated for street performances near Faneuil Hall was of the size that he contends. He has not demonstrated, however, that he exhausted alternate sources for the information he seeks from Ms. Slack. *Hutira*, 211 F. Supp. 2d*.* at 122 ("considerable difficulty" to obtain information

13

"does not relieve [the litigant] of trying initially to obtain the information elsewhere."). Without a proper showing that alternative sources do not exist, the Court will not override the reporter's privilege and force Ms. Slack to testify in connection with the plaintiff's case.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Ms. Slack's Motion to Quash. Ms. Slack is relieved from complying with the Court's subpoena issued on January 26, 2011 in connection with *Peck v. City of Boston*, No. 09-cv-10606 (D. Mass.). An Order consistent with this Memorandum Opinion will be entered.

March 8, 2011

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge